IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**JOY GRAY**                                                                                                        **PLAINTIFF**

v.                          **CASE NO. 4:25-cv-01057-LPR**

**RENEE MALLORY, et al.**                                                      **DEFENDANTS**

<u>**RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

**I.   INTRODUCTION**

Plaintiff's Motion for Preliminary Injunction should be denied because it is supported only by generic and conclusory allegations, a threadbare affidavit, and documentary evidence that does nothing to show that Plaintiff is likely to succeed on the merits of her claims. The First Amendment rights implicated by this case are important, but they are not absolute. An entire body of case law from the United States Supreme Court and the Eighth Circuit would not exist if there were not situations in which those rights must be balanced with compelling governmental interests and where, as here, the disruption of those governmental interests outweighed First Amendment considerations.

As demonstrated in the attached declarations from experienced Arkansas Department of Health ("ADH") personnel and Defendants' contemporaneously filed Motion to Dismiss, this is precisely one of those situations: Plaintiff's speech, controversial comments antithetical to ADH's core mission made on an extremely public forum from an account that she had recently used to promote her work as an ADH Branch Manager, did immediately disrupt and were reasonably likely to continue disrupt the efficient performance of ADH operations by not only Plaintiff herself, but of the agency as a whole. Accordingly, as explained more thoroughly below, Plaintiff is unlikely to succeed on the merits of her claim.

Plaintiff has likewise failed to establish the remaining *Dataphase* factors. She can point to no irreparable harm because her First Amendment rights are not being curtailed—she can still speak freely on social media. And even assuming she ultimately prevails on her claims, she could recover damages, illustrating any harm she may suffer is reparable. In contrast to her lack of irreparable harm, Defendants would suffer irreparable harm if the preliminary injunction were issued. Plaintiff would continue to disrupt the workplace and negatively impact the efficiency of Defendants' operations. The Court should therefore deny the preliminary-injunction motion.

## II.     RELEVANT LAW

### A.  *Preliminary Injunction Standard*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). When considering whether to grant a preliminary injunction, the Court must weigh four factors: "(1) [T]he threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

"The burden of proving that a preliminary injunction should be issued rests entirely with the movant." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). "The likelihood of success on the merits is the most significant" factor of the *Dataphase* factors, and "to that end, 'the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *S.J.W. ex. re. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012), and *CDI Energy Srvs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

### B.  *First Amendment Retaliation*

A plaintiff alleging First Amendment retaliation must "first make a prima facie showing that 1) she engaged in conduct protected by the First Amendment; 2) she suffered an adverse employment action; and 3) the protected activity was a substantial or motivating factor in the employer's decision to take the adverse employment action." *Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011).  Because Plaintiff was a government employee when she engaged in the speech at issue, the *Pickering-Connick* balancing test determines whether Plaintiff engaged in protected conduct to satisfy the first element of her prima facie case. *See Pickering v. Bd. Of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

Before reaching the *Pickering* balancing test, however, each side must reach a threshold issue: Plaintiff must demonstrate that she was speaking "as a citizen on a matter of public concern" and, if she does so, Defendants must establish that the speech in question "created workplace disharmony, impeded [Gray's] performance, …impaired working relationships" or otherwise "had an adverse impact on the efficiency of [ADH's] operations." *Melton v. City of Forrest City, Arkansas*, 147 F.4th 896, 902 (8th Cir. 2025) (quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020)).

To get to the *Pickering* balancing test, a public employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.  Moreover, courts are to give "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill,* 511 U.S. 661, 673, 673 (1994).  While courts are permitted to give substantial weight to these predictions, courts should not grant deference to "a government supervisor's bald assertions of harm based on conclusory hearsay and

rank speculation." *Melton*, 147 F.4th at 904 (quoting *Burnham v. Ianni*, 119 F.3d 668, 680 (8th Cir. 1997)).

Once the *Pickering/Connick* balancing test threshold is reached, the Court must "balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Nord v. Walsch County*, 757 F.3d 734, 740 (8th Cir. 2014). While this inquiry is a question of law for the court to resolve, in the Eighth Circuit the jury can act as a fact finder as to the issue of disruption, through special interrogatories or jury forms. *See Shands v. City of Kennett*, 993 F.2d 1337 (8th Cir. 1993).

Balancing the competing interests of the government employer and citizen-employee requires the Court to weigh several interrelated factors:

> 1) The need for harmony in the office or work place; 2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; 3) the time, manner, and place of the speech; 4) the context in which the dispute arose; 5) the degree of public interest in the speech; and 6) whether the speech impeded the employee's ability to perform his or her duties.

*Hemminghaus v. Missouri,* 756 F.3d 1100, 1114 (8th 2014). "At least five circuits have concluded that, because *Pickering's* constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of…qualified immunity." *Bartlett v. Fisher*, 972 F.2d 911, 916 (8th Cir. 1992).

"The *Pickering* balancing 'requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Richardson v. Sugg*, 448 F.3d 1046, 1062 (8th Cir. 2006) (citing *Connick*, 461 U.S. at 150). The Court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a

detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Hinshaw v. Smith*, 436 F.3d 997, 1004 (8th Cir. 2006) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

> Under the *Pickering/Connick* balancing test, the Court's analysis includes
>
> 1) The general authority and responsibilities of the employing governmental entity, 2) the nature and character of the specific employer-employee relationship, 3) the speech involved and 4) evidence tending to establish the speech's impact on the efficient operation of the government entity.

*Nord*, 757 F.3d at 740. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388.

### C. *Plaintiff's Remaining Causes of Action*

Defendants have concurrently filed with this Response a Motion to Dismiss, which addresses all of Plaintiff's claims except for her First Amendment retaliation claim. *See* Doc. No. 15. In the interest of efficiency, Defendants will not restate that analysis in the instant Response. Instead, Defendants incorporate those arguments as stated in their Motion to Dismiss, including both the relevant law and the analysis of Plaintiff's claims here. As Plaintiff's remaining claims other than the First Amendment retaliation claim should be dismissed at the pleading stage, it is certainly also true that they are unlikely to succeed on the merits and do not warrant a preliminary injunction on any of the grounds sought.

## III.   ANALYSIS

Defendants, in the declarations attached to this Response and as demonstrated in Plaintiff's own exhibits, establish sufficiently specific, detailed evidence of the present and future disruptive

5

impact of Plaintiff's relevant speech so as to both reach the *Pickering* balancing test and for that balancing test to weigh in favor of Defendant. Plaintiff is thus unlikely to succeed on the merits of her First Amendment retaliation claim and is entitled to neither reinstatement of her employment nor a neutral name-clearing hearing.

    A.  *Threshold Issues*

Defendants do not dispute that Plaintiff's speech was on a matter of public concern so as to trigger the threshold requirement that Defendants establish that said speech "created workplace disharmony, impeded [Gray's] performance, …impaired working relationships" or otherwise "had an adverse impact on the efficiency of [ADH's] operations." *Melton v. City of Forrest City, Arkansas*, 147 F.4th 896, 902 (8th Cir. 2025) (quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020)). As detailed below and in six detailed declarations from ADH employees, Plaintiff's speech impeded Plaintiff's ability to perform her extremely public-facing role and was reasonably certain to impair critical working relationships with legislators, county and local government officials, and community partners. This is sufficiently disruptive to meet Defendants' threshold obligations under the *Pickering/Connick* analysis.

    1.  <u>Plaintiff's Speech was Disruptive and Undermined the Core Mission of the Arkansas Department of Health, her Public Employer.</u>

Plaintiff's speech, which mocked and made light of the shooting of a public figure (see Exhibit 1, Screenshots of Plaintiff's Facebook Comments), directly undermines the basic function of ADH. As stated by ADH Secretary Renee Mallory, the speech in question is "directly antithetical to ADH's overall mission of protecting and ensuring the health of human beings in Arkansas and across the country." Exhibit 3, Declaration of Renee Mallory at ¶ 10. Plaintiff's comments were not only immediately linked to ADH, but resulted in a flaring up of anti-ADH sentiment that ADH has sought to combat since public health agencies became divisive during the

Covid-19 pandemic. *See* Exhibit 2, Screenshots of Twitter/X posts about Plaintiff's comments stating, "ahhhh department of health, shocker." Since the pandemic resulted in ADH and other public health agencies becoming more divisive, ADH has been "working tirelessly to build public trust in its missions and operations" and Secretary Mallory reasonably predicted that "when the public feedback to Ms. Gray's comments began coming in that Ms. Gray's continued employment was a danger to the precarious external relations work critical to ADH operations." Ex. 3 at ¶¶ 15, 17.

ADH Chief of Staff Don Adams further buttressed the Secretary's concerns, stating that "[b]ased on my 35 years of experience with ADH, I also believe the nature of Ms. Gray's comments directly undermines the core mission of ADH…and that ADH's hard-won public trust, which is integral to the ability to efficiently accomplish [its] mission, would have taken a significant hit had she remained employed." Exhibit 4, Declaration of Don Adams at ¶ 34. ADH Deputy Director of Health Programs Cassie Cochran states that she believes Gray's "comments directly undermined ADH's focus on protecting the health and safety of all individuals regardless of political persuasion." Exhibit 5, Declaration of Cassie Cochran at ¶ 12.

This undermining of public trust and inflaming of anti-ADH sentiment is not without serious, potential real world consequences: ADH Director of the Office of Preparedness and Emergency Response Systems Joe Martin, based in part on the August 2025 shooting at the Center for Disease Control in Atlanta, felt the need to bring social media mentions of ADH made in regard to Plaintiff's comments to the attention of senior leadership because they "1) present a security concern to ADH and 2) cause reputational harm to ADH." Exhibit 6, Declaration of Joe Martin at ¶¶ 8-10.

  2. <u>Plaintiff's Speech was uniquely disruptive to ADH's operations because of her public-facing and politically-collaborative branch manager position.</u>

More disruptive even than the general undermining of ADH's core mission, however, is the disruption that Plaintiff's speech resulted in and would reasonably have continued to result in due to her outward-facing role as a branch manager, a position that requires routine and consistent partnerships with external stakeholders such as legislators, county government personnel, and community and health partners. Plaintiff's speech, as outlined in every declaration submitted by ADH employees, undoubtedly diminished and imperiled these critical relationships and would have reasonably disrupted ADH operations had she continued her employment.

ADH Deputy Director for Boards & Governmental Affairs Matt Gilmore, based on his years of experience in a legislative affairs role with ADH and other organizations, specifically outlines in his declaration the nature of this present and future disruption. *See* Exhibit 7, Declaration of Matt Gilmore, generally. Gilmore concludes based on his years of experience that Gray's "presence would have been disruptive" and that "public comments were immediately disruptive to ADH's critical relationship with the state legislature and would have only become worse with continued employment." *Id.* at ¶¶ 10, 11.

This was not conclusory or mere conjecture but is instead supported by specific details about Plaintiff's legislative responsibilities and legislative response to her comments. As part of of his duties at ADH, Gilmore "spoke directly to legislators concerned with [Gray's] comments and heard through my connections with the legislature that more legislators were concerned with Ms. Gray's comments." *Id.* ¶ 7. Such concern was not abstract, as "[l]egislative support of ADH operations in the form of funding appropriation and oversight is critical to the effectiveness and efficiency of ADH programs" and "[w]ith an upcoming fiscal session, [Gilmore believes] her comments, had she remained employed, could have resulted in budgetary consequences for not only the Agency's tobacco cessation efforts, but for the Agency as a whole."*Id.* ¶ 12

8

Further, Ms. Gray's role required her to appear before various governing bodies "including but not limited to the Tobacco Settlement Commission, the Tobacco Prevention and Cessation Program Advisory Committee, Legislative committees, and UAPB's set-aside committee." *Id.* ¶ 9. By the time of her termination, Gilmore had "already heard from multiple other community partners, including but not limited to an ADH Tobacco Settlement Commission member and the Arkansas Heart Association, about her comments." *Id.* ¶ 14. Gilmore further concluded that "[b]ased on my years of working with ADH Boards and Commissions and other external stakeholders in the agency's tobacco cessation and prevention efforts, that Ms. Gray's public comments did and would have continued to cause disruption to those important external relationships necessary for that program to succeed." [cite]

Gilmore's specific and reasonable predictions of disruption are supported and echoed by other members of ADH's leadership team. Cochran, who has worked in a variety of ADH roles over the last 18 years, describes Plaintiff's position of Branch Manager of the Tobacco Prevention and Cessation Branch as "very public facing" and outlines that her job "required her to promote her programs on the morning show circuit and to interface with and make appearances with high-dollar and high-profile sponsorships involving her programming." Ex. 5 at ¶¶ 7, 8. After describing the manner in which Plaintiff's job required her to work in schools and communities to build partnerships, Cochran states that "based on my years of experience running and overseeing critical ADH programming efforts, I believe her comments would have affected her ability to do her job at the level necessary to avoid disruption to ADH operations" and that Cochran does "not believe that [Gray] could have continued to appear before the legislature or interact with critical community coalitions around the state." *Id.* at ¶¶ 10, 11.

Cristy Sellers, ADH Director for the Division of Health Advancement for more than nine years and a 25-year employee of ADH, agreed with the decision to terminate Plaintiff because "the public-facing nature of her position as Branch Manager of a high-profile branch would not have allowed her to effectively accomplish her branch's goals and mission going forward." Exhibit 8, Declaration of Cristy Sellers at ¶ 15. Sellars describes how all branch managers including Plaintiff must be the public face of the specific program they manage, attend public meetings, meet with community partners, health entities, general members of the public, and the legislature. *Id.* at ¶¶ 16-18. Sellers describes with specificity the relationships and coalitions that were imperiled by Plaintiff's public comments and states that "based on my decades of experience at ADH and my nearly nine years running the preventative program division, [she] believe[s] Ms. Gray's comments diminished and would have continued even more severely diminishing our ability to work with these coalitions." *Id.* ¶ 21. Sellers goes one step further, stating that "Ms. Gray's comments would have caused ADH trouble in getting cooperation from community partners across the state and would have resulted in individuals and certain groups refusing to collaborate or partner with ADH or the Tobacco Cessation and Prevention program in particular." *Id.* ¶ 22.

ADH Chief of Staff Don Adams outlined the decision to terminate Plaintiff, stating that it was based on two violations of the ADH Employee Disciplinary Policy, one of which allows for discipline up to termination for "[t]he use of threatening or abusive language or actions, posting of offensive materials, any harassment, or discourteous, indecent, or immoral conduct" and one which allows for discipline up to termination for "employees who engage in any type of conduct or performance that may be injurious to the Agency, or which interferes with the efficient operations, damages the reputation of ADH, or interferes with the Agency's ability to serve customers and the public." Ex. 4 at ¶¶ 16-19. Adams' declaration outlines, as other declarations

10

have shown, how Plaintiff was the public face of a high-profile program that required her to maintain integral external relationships with Agency partners. Ex. 4, generally. Adams concludes, based on more than 35 years of ADH experience, that "it was reasonable to predict that Ms. Gray's inflammatory public comments would severely disrupt ADH and TPCB operations because of the impact those comments would have on political partnerships necessary to accomplish those operations." *Id.* ¶ 27.

Beyond just her own programs, however, Adams highlights how it was reasonable to predict that Ms. Gray's continued employment could reasonably imperil community partnerships in all 75 counties that facilitate ADH's Local Health Units – operations that rely on county partnerships to provide essential services to Arkansans. *Id.* at ¶¶ 29-33. Adams' declaration is specific and detailed in describing how bedrock ADH programs such as immunizations, maternity services, reproductive health services, and communicable disease prevention could reasonably be made completely unavailable to Arkansas in certain counties because of the effect that Ms. Gray's comments on rural community partnerships. *Id.* ¶ 33.

Finally, beyond the actual and reasonably foreseeable disruption to work relationships outlined above, Plaintiff's immediate supervisor Cristy Sellers states in her declaration that "from a personnel management perspective, there are staff at ADH that I believe would not have wanted to work with her anymore as her comments became public, which would have been disruptive to our operations." Ex. 8 at ¶ 23.

Together, these declarations and exhibits clearly establish the level of disruption necessary to reach the *Pickering*/*Connick* balancing test. Multiple declarants, in detail and based on their years of relevant and specific expertise in the external relations work required at Plaintiff's level of employment with ADH, outline the manner in which Plaintiff's comments specifically disrupt

key relationships and create disharmony with critical partners in the Tobacco Cessation and Prevention program.

> 3. <u>Plaintiff's outward-facing and politically-entangled position is distinguishable from the disruption analysis in *Melton* or lawsuits involving educators.</u>

In *Melton*, the Eighth Circuit found that summary judgment was inappropriate based on deference given to the employer's evidence of disruption by the district court. 147 F.4th 896 (2025). *Melton*, however, is both procedurally and factually distinguishable from the instant case.

First, the Eighth Circuit's reversal is to a grant of summary judgment, and it describes the issue of disruption of public services to have been a "tossup" that should have gone to the jury, and not decided as a matter of law. *Id.* at 903. A tossup does not equate to the likelihood of success on the merits that Plaintiff must prove at the preliminary-injunction stage. So even if the disruption issue could be considered a tossup in the instant case, that would not be sufficient to show entitlement to a preliminary injunction.

Second, the factual distinction between a firefighter and a public-facing branch manager of an agency engaged in routine and integral community and legislative partnerships is significant. A firefighter's ability to perform the public safety functions of his job is not necessarily limited or disrupted by political discord or community backlash surrounding his public comments (though a jury could find that it is). Plaintiff's job, however, necessarily relies on her political goodwill, which was directly diminished by her comments and ADH officials reasonably predicted the disruption of that goodwill to key partnerships would only worsen the longer she was employed. Political and community backlash to Plaintiff's comments directly and negatively affects her ability to perform the essential public-facing functions of her job, unlike a firefighter or an art professor, who can continue to perform their essential duties despite any such backlash. As a result,

12

unlike in *Melton*, here the established evidence clearly supports Defendants' showing that there was a disruption of services sufficient to reach the *Pickering/Connick* balancing test.

### B. The Pickering/Connick *analysis weighs in favor of ADH Defendants.*

A review of the *Pickering/Connick* factors outlined above demonstrates that the balancing test weighs heavily in favor of ADH Defendants, primarily based on the present and anticipated deterioration of key relationships caused by Plaintiff's speech which would prevent from her properly performing the duties of her job. The second factor of the balancing test requires the Court to analyze whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate. *Hemminghaus*, 756 F.3d at 1114. Defendants will not repeat the extensive factual showings from the preceding section, but it is well-established through the attached declarations that Ms. Gray's specific position with ADH required close working relationships to exist between her and legislators, community partners, and county and local government officials that were certain to deteriorate because of the speech in question.

Similarly, Defendants have established that Plaintiff's social media comments impeded her ability to perform her duties. Multiple declarants outline for the Court the extensive nature of Plaintiff's outward facing duties, both with the legislature and with community partners. Backlash to her comments from the very individuals she necessarily partners with to accomplish her program's mission inarguably impedes her ability to perform her duties. Not only does such present and reasonably foreseeable future backlash imperil her own program, but as outlined by Don Adams and others, it imperils bedrock ADH functions and the job duties of many other ADH employees whose budgets could be affected.

The weight of these two factors exceeds any of the factors that could weigh in Plaintiff's favor, particularly as it is Plaintiff's own obligation to prove she is likely to succeed under the balancing test, not Defendant's burden to prove otherwise; Plaintiff's lack of evidence outlining the context or public importance of her speech prevents her from doing so. For example, Plaintiff's complaint and affidavit do not establish when, where, or how she posted the comments. It is entirely possible based on the timeline of Charlie Kirk's assassination, which occurred during work hours in the middle of the work week, that Plaintiff's statements came while she was at work.

Considering the evidence presented by each side and the public-facing nature of Plaintiff's position, the balancing test weighs in favor of ADH Defendants and the strong government interest to prevent present and future disruption to key ADH operations. Further, even if there are factual disputes as to the disruptive nature of Plaintiff's speech, those disputes do not indicate a likelihood to succeed on the merits necessary to warrant extraordinary relief in the form of a preliminary injunction, and instead, the issue should be properly left to the finder of fact to decide in due course without immediate relief.[1]

Finally, Plaintiff has not established any evidence showing that she is likely to succeed on the merits on her claim to receive a name-clearing hearing, this Court should deny the requested preliminary injunction as to that relief as well. As more fully stated in Defendants' Motion to Dismiss, Plaintiff fails to allege with any specificity the dissemination of stigmatizing information to warrant such a hearing. She does not allege or establish who disseminated such information, the content of such information, or to whom it was disseminated. In fact, Plaintiff's own motion makes

---

[1] In the alternative, should the Court grant a preliminary injunction, Defendants request that the result be that Plaintiff is placed on paid administrative leave pending the outcome of the lawsuit, so as to avoid as much disruption, shifting of responsibilities, and staffing turnover as possible.

such a request in the conditional, stating that there should be a "prompt, neutral name-clearing hearing *if* stigmatizing reasons are disseminated." Doc. No. 3 at 7 (emphasis added).

### C. *The remaining Dataphase factors also weigh in favor of denying Planitiff's request for a preliminary injunction.*

While the Plaintiff's failure to demonstrate a likelihood of success on the merits should be enough on its own to warrant denial of her preliminary injunction request, the other three *Dataphase* factors also weigh in favor of denial.

First, as to irreparable harm, when a plaintiff is unlikely to succeed in showing his First Amendment rights have been violated, that plaintiff has not shown a threat of irreparable harm that warrants preliminary injunctive relief. *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 738 n. 11 (8th Cir. 2008)). In *Planned Parenthood*, the Eighth Circuit held that "[w]ithout a showing that it will likely prevail on its [First Amendment] claim…[plaintiff's] asserted threat of irreparable harm is correspondingly weakened in comparison to the State's (and the public's) interest…" 530 F.3d at 738 n. 11. Because Plaintiff is unlikely to succeed in showing a First Amendment violation due to the disruptive nature of the speech at issue, she is also unable to demonstrate the necessary irreparable harm to warrant a preliminary injunction.

Further, even if Plaintiff could demonstrate a violation of her First Amendment rights, it is not ongoing: Plaintiff is not being restrained in any way and is free to express herself however she desires in any forum public or private. And even assuming she could show retaliation, she would likely be able to recover damages for it in this lawsuit, making the harm reparable and further weighing in Defendants favor as to this factor.

Second, as to the balancing of the Plaintiff's harm and the harm to the other litigants should relief be granted, Defendants would be significantly prejudiced by an injunction that interfered

15

with their ability to most efficiently operate government services and to manage their own workforce. "[A]n outright grant of preliminary relief in employee discharge cases defeats the employer's prerogative of discharge. A preliminary injunction could put off the discharge of a potentially incompetent employee for many months." *O' Connor v. Peru State College*, 728 F.2d 1001, 1003 (8th Cir. 1984). This is particularly true given the extensive evidence that Defendants have provided demonstrating the potential disruption that is likely to occur if Defendants were not permitted to exercise their experienced judgment in deciding to terminate Plaintiff.

Such a curtailing of public employer discretion is not dissimilar to the United States Supreme Court's recent holding in *Trump v. Wilcox*, in which the Court held that a stay of the President's power to manage executive officers "reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." 145 S. Ct. 1415, 221 L. Ed. 2d 985 (2025).

Finally, the public interest weighs in favor of denying Plaintiff's request. As outlined thoroughly above, ADH leadership reasonably believed that numerous integral and critical functions that ADH performs statewide, including maternal health, providing immunizations, and other Local Health Unit functions, were imperiled by Plaintiff's inflammatory comments.

## IV.   CONCLUSION

Defendant has established, through the evidence and argument presented in this Response together with their incorporated Motion to Dismiss as to the non-First Amendment claims, that Plaintiff is not likely to succeed on the merits of her claim. Plaintiff's speech was sufficiently disruptive to ADH present operations and to its operations in the reasonably foreseeable future so as to establish that her comments are not protected speech sufficient to sustain a First Amendment

16

retaliation claim. This unlikeliness of success on the merits weighs against granting a preliminary injunction, as do all other *Dataphase* factors.  The Court should deny the motion.

    Respectfully submitted,

    TIM GRIFFIN
    Attorney General

By:    Carl F. "Trey" Cooper, III
    Ark Bar No. 2007294
    Senior Assistant Attorney General
    Office of Arkansas Attorney General
    101 West Capitol Avenue
    Little Rock, AR 72201
    PH:    (501) 682-3658
    Fax:    (501) 682-2591
    Email: trey.cooper@arkansasag.gov

*Attorneys for Defendants*