# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**JOY GRAY**                                                                    **PLAINTIFF**

**v.**                              **Case No. 4:25-cv-01057-LPR**

**RENEE MALLORY,** *in her Individual
capacity and in her Official capacity as
Secretary of the Arkansas Department of
Health*; **DON ADAMS,** *in his Individual
capacity and in his Official capacity as Chief
of Staff at the Arkansas Department of
Health*; **CASSIE COCHRAN,** *in her
Individual capacity and in her Official
capacity as Deputy Director of Programs at
the Arkansas Department of Health*;
**CRISTY SELLERS,** *in her Individual
capacity and in her Official capacity as
Director of Health Advancement at the
Arkansas Department of Health*; **and
REGGIE ROGERS,** *in his Individual
capacity and in his Official capacity as
Deputy Chief Legal Counsel at the Arkansas
Department of Health*[1]                                    **DEFENDANTS**

## ORDER

Earlier this year, Charlie Kirk was assassinated.  In the decade leading up to his

assassination, Mr. Kirk had become an influential and high-profile advocate for political, social,

and religious conservatism.  It thus should be no surprise that many Americans felt a desire to say

---

[1] The Complaint is brought against, among other people, "Don Adams, [i]n his Individual capacity and in his Official capacity as Chief of Staff in the Office of the Governor."  Compl. (Doc. 1) at 1.  But Mr. Adams does not have that role, and he never did.  Mr. Adams is the Chief of Staff at the Arkansas Department of Health.  *See* Ex. 4 (Decl. of Don Adams) to Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 17-4) at 1.  The Court finds that Ms. Gray intended to sue Mr. Adams, as opposed to the Governor's Chief of Staff.  Accordingly, the Court directs the Clerk to update the caption and docket of this case to reflect Mr. Adams' actual position.  If Ms. Gray intended to sue the Governor's Chief of Staff—either instead of Mr. Adams or in addition to Mr. Adams—the Complaint will need to be amended for that purpose.  However, because there is a pending Motion to Dismiss (which is not the subject of today's Order), the Court suggests that Ms. Gray hold off on amending her Complaint for now.  In resolving the Motion to Dismiss, the Court may conclude that the Complaint has other deficiencies that Ms. Gray could potentially remedy through amendment.

their piece about his assassination. And, consistent with the law of truly large numbers, some Americans chose to make comments that were incredibly insensitive to or dismissive of Mr. Kirk's murder, hateful towards Mr. Kirk personally, or supportive of political assassinations generally. A subset of those people were fired from their jobs for making such comments.[2]

In the instant case, the Arkansas Department of Health fired Joy Gray after she made comments on Facebook about Mr. Kirk's assassination.[3] All parties acknowledge that Ms. Gray's termination was linked to the nature of her comments.[4] Ms. Gray, therefore, claims that her firing constitutes unconstitutional retaliation for protected speech.[5] She brings suit against the Department and a number of Department officials under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and section 16-123-106 of the Arkansas Civil Rights Act.[6] Currently pending before the Court is Ms. Gray's request for preliminary injunctive relief.[7] Her primary request is that the Court order

---

[2] Br. of Amicus Curiae American Civil Liberties Union of Arkansas (Doc. 26) at 4–6; *accord* Nicholas Bogel-Burroughs & Bernard Mokam, *A Broad Wave of Firings Followed Charlie Kirk's Assassination*, N.Y. TIMES (Sep. 26, 2025), https://www.nytimes.com/2025/09/26/us/kirk-critics-fired-free-speech.html ("More than 145 people in a wide range of occupations have been fired or disciplined after they made statements about the assassination of Charlie Kirk.").

[3] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 2–3; Aff. of Joy Gray (Doc. 6) at 3; Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 17) at 1–2, 6, 10–11. Commenting on a Facebook post concerning Mr. Kirk, Ms. Gray said, "Oh no, what if he's ok?" Ex. 1 to Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 17-1) at 1. Then, in response to another commenter characterizing Ms. Gray's statement as "evil," Ms. Gray said "[Y]eah[,] just like his quote about needing some unfortunate deaths for the 2nd amendment. He knew the risks and was shot doing his evil in the public." *Id.* at 1–2. Other Facebook comments by Ms. Gray included: (1) "[W]ell[,] he died for his cause"; (2) "I'm sure Charlie prayed all the time and look how that worked. Or did it? We'll never know"; and (3) "I'm all for reform and agendas at any time. But, meh on his death. I guess in a weird way maybe Charlie will have died for reform to happen. Omg[,] maybe the prayers DID work[.]" *Id.* at 3–5.

[4] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 2–3; Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 17) at 1–2, 6, 10–11.

[5] Compl. (Doc. 1) at 4; Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 4–7.

[6] Compl. (Doc. 1) at 4–6. In addition to her retaliation-for-protected-speech allegation, Ms. Gray also claims that the Department violated her procedural due process rights. Specifically, she claims that the Department failed to afford her a pre-termination hearing to contest her termination and a post-termination hearing to clear her name. *See id.* at 4–5.

[7] Pl.'s Mot. for Prelim. Inj. (Doc. 2).

the Department to re-hire her (or at least continue paying her) for the pendency of this litigation.[8] Her fallback request is that the Court order the Department to immediately provide her a "name-clearing hearing" so that she can "explain herself and put out her side of [the story] and try to maybe minimize the [reputational] damage[]."[9]

For the reasons set out in Parts I and II below, the Court denies Ms. Gray's request for preliminary relief in its entirety. But the Court wishes to emphasize that its denial should not be misunderstood as a comment on the merits of Ms. Gray's retaliation-for-protected-speech claim. Given the embryonic state of the litigation, the current paucity of hard evidence on issues critical to a fair application of *Pickering*,[10] and the prospect of additional relevant evidence,[11] Ms. Gray's retaliation-for-protected-speech claim may end up presenting an exceedingly difficult and close merits question. The Court need not, and does not, make any predictions today about which party is likely to ultimately prevail on the merits.

The reason the Court need not make any merits-related prediction concerning the retaliation-for-protected-speech claim is that Ms. Gray has failed to show that she is likely to experience irreparable harm in the absence of the preliminary injunctive relief she requested. And,

---

[8] *See* Compl. (Doc. 1) at 6; Pl.'s Mot. for Prelim. Inj. (Doc. 2) at 1–2.

[9] *See* Nov. 17, 2025 Hr'g Tr. (rough) at 12:05:18–12:06:25; Pl.'s Mot. for Prelim. Inj. (Doc. 2) at 1–2. A name-clearing hearing is, admittedly, something of an odd duck. According to governing caselaw, a name-clearing hearing provides an employee or former employee an opportunity to challenge "stigmatizing" statements an employer has made public about the employee or former employee. *See Winskowski v. City of Stephen*, 442 F.3d 1107, 1110 (8th Cir. 2006). The idea seems to be that "[a]n employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Id.* (quoting *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994)). And, in such circumstances, the procedural due process protections of the Fourteenth Amendment "are vindicated by 'a name-clearing hearing at a meaningful time' during which the employee can respond to the employer's accusations." *Id.* (quoting *Schleck v. Ramsey Cnty.*, 939 F.2d 638, 642 (8th Cir. 1991)); *see also Codd v. Velger*, 429 U.S. 624, 627 (1977) ("[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment . . . . where a[n] . . . employee has been stigmatized in the course of a decision to terminate his employment is solely to provide the person an opportunity to clear his name.") (quotation and citation omitted)).

[10] *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

[11] *See* Nov. 17, 2025 Hr'g Tr. (rough) at 1:21:25–1:22:32.

as the Eighth Circuit has clearly explained, "[t]he failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'"[12]  Accordingly, the Court will withhold forming and expressing an opinion on the merits of the retaliation-for-protected-speech claim until the record is more fully developed.

## I. The Absence of Irreparable Harm

The Supreme Court and the Eighth Circuit have long emphasized that "[a] preliminary injunction is an 'extraordinary and drastic remedy.'"[13]  This is especially so when a federal court is being asked to enjoin an action of a state government.  In such circumstances, both separation-of-powers issues and federalism issues loom large.  After all, plaintiffs are asking an unelected federal judge to interfere with the operations of an elected branch of a state even though the federal judge has not yet determined whether the state violated the Constitution or federal law.[14]  Judge Bibas, writing for the Third Circuit, puts it somewhat more poetically: "A preliminary injunction forces a party to act or desist from acting, not because the law requires it, but because the law *might* require it.  In this sense, it is like judgment and execution before trial."[15]  Judges should think long and hard before they exercise that type of power.

The burden of proving entitlement to preliminary relief falls on a plaintiff.  And the Supreme Court and the Eighth Circuit have explained that a plaintiff is not entitled to a preliminary

---

[12] *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (alteration in original) (quoting *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021)).

[13] *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (alteration in original) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)).

[14] It is true, of course, that part of the preliminary injunction analysis calls for a judge to look at a plaintiff's likelihood of success on the merits.  But this factor is evaluated using either the "fair chance" standard or the "more likely than not" standard.  *See Planned Parenthood Minn., N. D., S. D. v. Rounds*, 530 F.3d 724, 730–33 (8th Cir. 2008) (en banc).  In the best of circumstances, a predictive guess (often based on very limited information) about whether it is more likely than not that a state has violated the Constitution or federal law is significantly different (in degree and in kind) from a full-and-final determination that a state actually has violated the Constitution or federal law.

[15] *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024) (internal quotations and citations omitted), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S. Ct. 1049 (2025).

injunction unless she shows that she "is likely to suffer irreparable harm in the absence of preliminary relief."[16]  That is because "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."[17]  Said a little differently, a plaintiff's likelihood of suffering irreparable harm is the only thing that can justify the incredibly aggressive use of judicial power to restrain the behavior of a defendant (especially a state defendant) before it is conclusively proven that the defendant did anything unlawful.

Irreparable harm is harm for which "a party has no adequate remedy at law" because the party's "injuries cannot be fully compensated through an award of damages."[18]  And, on the present record, Ms. Gray has not shown that she is likely to suffer irreparable harm in the absence of a preliminary injunction.  Harm, sure.  But not irreparable harm.  The loss of a job—yes, even a government job—does not typically constitute irreparable harm in and of itself.  That much has been made crystal clear by the Supreme Court.[19]  It is also not particularly surprising—because a terminated employee can be made whole by money damages (and perhaps reinstatement) if she wins her case.[20]

Ms. Gray does not assert that she will be unable to be made whole by money damages at the end of her case.  Indeed, her Complaint affirmatively seeks such damages.[21]  Nor does Ms. Gray suggest any unique circumstance that might create an atypical irreparable harm related to the loss of a job.  Ms. Gray does not, for example, suggest that losing her job will lead to

---

[16] *Hotchkiss*, 115 F.4th at 894 (quoting *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam)).

[17] *Id.* at 893 (quoting *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1039 (8th Cir. 2016)).

[18] *Grasso*, 809 F.3d at 1040 (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

[19] *See Sampson v. Murray*, 415 U.S. 61, 88–90 (1974).

[20] *See id.* at 90 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (quoting *VA. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))).

[21] *See* Compl. (Doc. 1) at 6.

bankruptcy, or to an inability to obtain life-saving medication.  Instead, dedicating only one sentence of her briefing to irreparable harm, she places all her eggs in the presumption-of-irreparable-harm basket.[22]  That is, Ms. Gray's entire irreparable-harm argument boils down to a quote from a Supreme Court plurality in *Elrod v. Burns*: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable [harm]."[23]

Let's call this the *Elrod* maxim.  The Court can't really fault Ms. Gray for pointing to the *Elrod* maxim and just leaving it at that.  As one legal scholar has noted, many courts do the exact same thing.[24]  "Courts employing the presumption [of irreparable harm] in constitutional cases have not engaged in lengthy elaborations of the reasons for the presumption's use."[25]  Instead, "[t]hey simply cite[] the Supreme Court's decision in *Elrod v. Burns* as grounds for the presumption."[26]  This unfortunate practice has left plaintiffs with the perception that a finding of irreparable harm *automatically* flows from a finding of likelihood of success on the merits of a First Amendment constitutional claim.  But, as the Eighth Circuit has made clear, this "interpretation of . . . *Elrod* is simply not the law . . . ."[27]

---

[22] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 6.

[23] *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[24] *See* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 HARV. J. L. & PUB. POL'Y 743, 763 (2012).

[25] *Id.*

[26] *Id.* (footnote omitted).

[27] *Hotchkiss*, 115 F.4th at 894.  Courts blindly and blithely relying on the presumption of irreparable harm in constitutional cases presents real danger.  "The presumption obscures the perhaps discomforting reality that many constitutional infractions produce either no injury or one that damages can adequately redress."  DiSarro, *supra* note 24, at 746.  The presumption thus "invites applications for preliminary injunctions in constitutional cases by eliminating what is usually the most difficult element for a plaintiff to satisfy."  *Id.* at 747.  And this opens the door to judicial tyranny.  *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 857–58 (2025) (equating attempts to "[w]av[e] away attention to the limits on judicial power" with "embracing an imperial Judiciary"); *see also* DiSarro, *supra* note 24, at 750 ("There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or is more dangerous in a doubtful case, than the issuing [of] an injunction.  It is the strong arm of equity, that never ought to be extended, unless to cases of great injury where courts of law cannot afford an adequate or commensurate remedy in damages." (quoting 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE AS

To be sure, in the Eighth Circuit, showing a likelihood of success on the merits in a constitutional case—whether under the First Amendment or some other Amendment—usually indicates irreparable harm is likely in the absence of a preliminary injunction. That is because, "[i]n most instances, constitutional violations constitute irreparable harm."[28] But most is not all, and "the assertion of a possible constitutional violation does not release plaintiffs from their burden of showing that irreparable harm" is likely to occur in the absence of preliminary relief.[29] This is true whether or not we happen to be in the First Amendment context. Indeed, the Eighth Circuit has explicitly rejected the universal application of the *Elrod* maxim in a First Amendment case.[30]

The real question to be answered—inside and outside the First Amendment context—is whether a plaintiff can show that the challenged state action *will likely* threaten or violate her constitutional rights in the absence of preliminary relief.[31] And, logically speaking, that is only possible where the constitutional harm is presently occurring or set to occur in the imminent future.

---

ADMINISTERED IN ENGLAND AND AMERICA, § 959b, at 172 n.1 (11th ed. 1873))). But the danger goes beyond the academic:

> In preliminary injunction proceedings, important constitutional questions will be decided tentatively and usually upon an incomplete evidentiary record produced at abbreviated and rushed hearings. They will lead to appeals that apply the least rigorous appellate standard. Final judgments on constitutional questions, by contrast, will produce definitive holdings and be subject to nondeferential appellate review.

DiSarro, *supra* note 24, at 747. This Court is not the only one—and certainly not the most eloquent one—to recognize the serious risks that the presumption of irreparable harm poses to our constitutional order. *See generally Del. State Sportsmen's Ass'n*, 108 F.4th 194.

[28] *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (citing *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017)).

[29] *Id.* (citing *Sessler*, 990 F.3d at 1156).

[30] *See Hotchkiss*, 115 F.4th at 893–94; *accord Rodgers v. Bryant,* 942 F.3d 451, 466 (8th Cir. 2019) (Stras, J., dissenting in part) ("To be sure, as the court claims, showing a strong likelihood of success on the merits *generally* entitles a plaintiff to a preliminary injunction in First Amendment cases. But this maxim is not absolute and only gets the court so far. After all, a preliminary injunction 'does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits,' even in First Amendment cases, and the district court must still consider the other factors and show its work." (first citing *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 762 (8th Cir. 2019); and then quoting *Benisek*, 585 U.S. at 158)).

[31] *See Morehouse*, 78 F.4th at 1017–18 ("The plaintiffs have not clearly shown how the Final Rule will prevent them from engaging in constitutionally protected conduct.").

Accordingly, rightly understood, the *Elrod* maxim is limited to cases where "First Amendment interests were either threatened or in fact being impaired *at the time relief was sought*."[32]

The reason the *Elrod* maxim holds true in most First Amendment cases is that most First Amendment cases seek to enjoin a law or regulation that is actively chilling a plaintiff's speech. Think of the paradigmatic speech case. A plaintiff seeks to enjoin a law that threatens her with criminal sanctions for advocating pro-life positions near an abortion clinic. In the absence of a preliminary injunction, the law would continue to be effective and thus continue to chill the plaintiff's speech every day until the end of the trial. Each moment the law remained in effect, the law would actively impact the plaintiff's ability to speak. It is that type of harm—the active loss of the ability to engage in protected speech—that courts consider irreparable. And it is that type of present and future harm that is at issue in the overwhelming majority of First Amendment cases. So, in the overwhelming majority of cases, the *Elrod* maxim makes eminent sense.

Our case is different. Ms. Gray's challenge is not to a current or prospective law, regulation, or similar government action that is actively chilling (or imminently will begin chilling) her speech. Instead, Ms. Gray is challenging the Department's decision to terminate her from her job. That is a single, discrete act that took place entirely in the past. The Department is not currently chilling her speech. It can't be; she is no longer working for the Department. Therefore,

---

[32] *Hotchkiss*, 115 F.4th at 894 (quoting *Elrod*, 427 U.S. at 373); *see also Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) ("A preliminary injunction is not appropriate, however, 'unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" (quoting *Wagner v. Taylor*, 836 F.2d 566, 577 n.76 (D.C. Cir. 1987))).

the Department no longer has any power over her or her speech.[33]  At present, Ms. Gray can speak

her mind without any fear of retribution from the Department of Health.[34]

The Court acknowledges, of course, that Ms. Gray may currently be feeling the sting of

losing her job, and that sting may lead her to rein in her social commentary.  Indeed, one element

of a First Amendment retaliation claim is that the Government's action must be severe enough to

"chill a person of ordinary firmness from continuing [to speak]."[35]  But the sting of a past

termination is not the same as the fear of a future termination.  The latter actively chills speech.

The former does not.

In fact, if the Court were to preliminarily reinstate Ms. Gray, the Court might actually be

manufacturing irreparable harm instead of mitigating it.  Imagine Ms. Gray back at the Department

with the knowledge that the Department wants to fire her for the comments she made about

Mr. Kirk.  Ms. Gray would know that, at the end of this case (depending on its outcome), the

---

[33] Things would be different, of course, if Ms. Gray were still working at the Department and the Department were threatening to fire her for what she said about Mr. Kirk.  In that situation, the Department's threat would be currently chilling her from engaging in further speech related to Mr. Kirk's assassination—because she would reasonably surmise that further speech on the subject would likely result in her termination.  But that is not the case at bar.

[34] In any event, the Court notes that Ms. Gray has not even suggested that she wants to speak further concerning Mr. Kirk.  She has not said it in her Complaint, in her preliminary injunction request, in her affidavit, or at the preliminary injunction hearing.  Then-Judge Thomas, writing for the D.C. Circuit, found a similar point important when considering the limits of the *Elrod* maxim:

> The appellants assert that they are entitled to preliminary relief because the ban would discourage them from appearing, speaking, or writing.  They correctly point out that "[t]he loss of First Amendment freedoms, for even minimal periods of time," may constitute irreparable injury.  A preliminary injunction is not appropriate, however, "unless the party seeking it can demonstrate that 'First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought.'"  The appellants have shown neither.  Nothing in the record convinces us that the appellants will cease speaking or writing before the district court resolves their constitutional challenges.

*Nat'l Treasury Emps. Union*, 927 F.2d at 1254–55 (alterations in original) (internal citations omitted).

[35] *Aldridge v. City of St. Louis*, 75 F.4th 895, 899 (8th Cir. 2023) (quoting *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023)); *see also Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020) ("To establish a claim for First Amendment retaliation, [a plaintiff] must prove '(1) he engaged in a protected activity, (2) [the Government] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" (quoting *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013))).

Department *might* be free to fire her based on her past comments or any further similar comments she makes.  In that scenario, Ms. Gray's speech is very likely to be chilled.  The Court is not going to interfere with the employment decision of a state agency (or require it to expend money it will never recoup) where doing so could *increase* the irreparable harm faced by Ms. Gray.

It's worth noting that the Eighth Circuit is not the only circuit to acknowledge that the *Elrod* maxim is more limited than it seems at first blush.  The D.C. Circuit "has construed *Elrod* to require movants to do more than merely allege" a First Amendment violation "to satisfy the irreparable [harm] prong of the preliminary injunction frame-work."[36]  Among other things, they must "establish they are or will be engaging in constitutionally protected behavior" and "that the allegedly impermissible government action would chill allowable individual conduct."[37]  Similarly, in the Sixth Circuit, the *Elrod* maxim is just a "general rule" and "does not do away with the 'indispensable' prerequisite of showing a likelihood of immediate and irreparable harm."[38]  So "[e]ven if [p]laintiffs present a winning case on the merits, they must show that, absent the court's intervention," the government action being challenged is "likely to be applied to them while the case proceeds."[39]  The Third Circuit seems to travel the same path, looking for an active, current, and ongoing chill of speech by way of threatened government action.[40]

---

[36] *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

[37] *Id.*

[38] *Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 513 (6th Cir. 2025) (citing *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019)).

[39] *Id.* at 514 (citing *Sumner Cnty. Schs.*, 942 F.3d at 327–28).

[40] *See Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) ("It is well-established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable [harm].  But the assertion of First Amendment rights does not automatically require a finding of irreparable [harm] . . . .  Rather[,] the plaintiffs must show a chilling effect on free expression." (internal citations and quotations omitted)); *see also Del. State Sportsmen's Ass'n*, 108 F.4th at 203, 204 (noting that "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction[,]" and, thus, a plaintiff "must show that, without a preliminary injunction, they will more likely than not suffer irreparable [harm] *while proceedings are pending*." (emphasis added)) (first quoting *Hohe*, 868 F.2d at 73; and then citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017))).

The Second Circuit is even clearer about the limits of the *Elrod* maxim in public termination cases.[41]  After acknowledging that "the threat of permanent discharge can cause irreparable harm in the First Amendment context[,]" the Second Circuit explained that there is no such irreparable harm after a termination has already occurred:

> Appellants filed the at-issue motions for preliminary injunctions *after* they were terminated.  Therefore, they cannot show the "specific present objective harm or a threat of specific future harm" required of them.  Appellants' reliance on the Supreme Court's decision in *Elrod* for the proposition that ongoing irreparable harm can exist post-termination is inapt. . . .  Although it is true that most *Elrod* plaintiffs had already been terminated, the *Elrod* Court *did not* find irreparable harm *as to the post-termination plaintiffs*.  It found irreparable harm only for "one of the respondents [who] was . . . threatened with discharge" and other "class respondents . . . threatened with discharge or [who] had agreed to provide support for the Democratic Party in order to avoid discharge."  Because harm for these still-employed plaintiffs was "both threatened and occurring *at the time of [their] motion*" for a preliminary injunction, these plaintiffs could demonstrate irreparable harm.  *Elrod* instructs that because Appellants here had already been terminated at the time of their preliminary injunction motions, they were not suffering ongoing harms or threats of harm.  Having already been discharged, their harm is *compensable*, not *irreparable*.  Therefore, we deny Appellants' request for injunctive relief in the form of reinstatement and backpay.[42]

The bottom line of all this is that Ms. Gray cannot just point to *Elrod* and call it a day.  To show that irreparable harm is likely in the absence of a preliminary injunction, more is required of her.  And she has not given us anything more.  So, she cannot make out this indispensable part of the preliminary injunction framework.  This means she is not entitled to a preliminary injunction,

---

[41] *See New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 328–29 (2d Cir. 2025), *petition for cert. filed*, No. 25-126 (U.S. Aug. 1, 2025).

[42] *Id.* (internal citations omitted).  Relatedly, the Second Circuit noted that a preliminary injunction ordering a fired public employee back to work "do[es] nothing to abate" the chill on speech because "the source of the 'chill' is the permanent loss of" employment.  *Savage v Gorski*, 850 F.2d 64, 67–68 (2d Cir. 1988); *see also Am. Postal Workers Union, AFL-CIO v. USPS*, 766 F.2d 715, 722 (2d Cir. 1985) ("[W]e fail to understand how a chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech . . . stems . . . from the threat of permanent discharge, which is not vitiated by an interim injunction.").

even if the other *Dataphase* factors were to cut strongly in her favor.[43]  Accordingly, the Court

may (and does) deny her request without considering those other factors.

## II.  Ms. Gray's Request for an Immediate Name-Clearing Hearing

The Court now turns to Ms. Gray's request for preliminary relief on her name-clearing-

hearing claim.  With regard to that request, the Court's analysis primarily focuses on whether

Ms. Gray has shown a likelihood of success on the merits of her claim.  This *Dataphase* factor

often has an outsized role to play in the preliminary injunction framework.  In the Court's view,

Ms. Gray is very unlikely to succeed on the merits of her claim.[44]  She lacks even a fair chance of

success.  This is for several reasons.

First, Ms. Gray did not properly present this issue in her preliminary injunction request.

To be sure, the Motion itself requests that the Court: (1) "enjoin[] Defendants

from . . . disseminating stigmatizing reasons [for Ms. Gray's termination] without offering a

constitutionally adequate name-clearing hearing"; and (2) "[o]rder Defendants to provide a

prompt, neutral name-clearing hearing if they continue to publish or rely on stigmatizing

accusations . . . ."[45]  And the attached brief quickly mentions a name-clearing hearing in the

Introduction and Factual Background sections.[46]  But the brief does not include any legal

---

[43] *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) ("Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

[44] In the Eighth Circuit, "establish[ing] a procedural due process claim against a state employer for deprivation of a protected liberty interest in a public employee's reputation" requires a plaintiff to satisfy the following four elements: "(1) an official made a defamatory statement that resulted in a stigma; (2) the defamatory statement occurred during the course of terminating the employee; (3) the defamatory statement was made public; and (4) an alteration or extinguishment of a right or legal status." *Crooks v. Lynch*, 557 F.3d 846, 849 (8th Cir. 2009) (quoting *Brown v. Simmons*, 478 F.3d 922, 923 (8th Cir. 2007)).  In addition to these elements, a plaintiff "must prove he requested and was denied a name-clearing hearing." *Id.* (citing *Winskowski*, 442 F.3d at 1112).

[45] Pl.'s Mot. for Prelim. Inj. (Doc. 2) at 1–2.

[46] *See* Pl.'s Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 2, 3.

arguments whatsoever about the name-clearing-hearing claim. The Argument section focuses exclusively on the retaliation-for-protected-speech claim.[47] That section makes arguments concerning the likelihood of success on the merits, irreparable harm, balance of the equities, and the public interest with respect to the retaliation-for-protected speech claim. But there's not a peep with respect to the name-clearing-hearing claim. It is true that Ms. Gray's reply brief addresses the name-clearing-hearing claim.[48] But a plaintiff can't raise issues in a reply brief that were never developed in her opening brief.

Second, Ms. Gray does not appear to have ever requested a name-clearing hearing. There is evidence in the record that she inquired about, was informed about, and pursued the Department's grievance/appeal process.[49] Her grievance/appeal was denied.[50] But there is no evidence in the record to suggest that she then (or ever) requested a name-clearing hearing. And the Eighth Circuit has made clear that a person is only entitled to a name-clearing hearing if they request one.[51] Ms. Gray's position appears to be that her inquiries about the grievance and appeal process were close enough to count as a request for a name-clearing hearing.[52] Based on the very limited evidentiary record currently before the Court, the Court does not agree. Perhaps additional evidence will come to light to change the Court's mind, but right now that appears highly unlikely.

Third, the Court is far—very far—from being persuaded that the statements made by the Department were "so damaging as to make it difficult or impossible for [Ms. Gray] to escape the

---

[47] *See id.* at 3–7.

[48] *See* Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. (Doc. 23) at 9–10.

[49] *See* Compl. (Doc. 1) at 3; Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. (Doc. 23) at 10; Aff. of Joy Gray (Doc. 6) at 3–4.

[50] *See supra* note 49.

[51] *See Crooks*, 557 F.3d at 849 (a plaintiff "must prove he requested and was denied a name-clearing hearing").

[52] *See* Nov. 17, 2025 Hr'g Tr. (rough) at 11:59:00–12:00:29.

stigma of those charges."[53]   If the statements don't meet that threshold, they don't count as stigmatizing and thus don't trigger the name-clearing-hearing requirement.  The Eighth Circuit has explained that "[t]he stigma must be significant, and it usually involves allegations of dishonesty, immorality, racism, or a similar character-demeaning charge."[54]   Indeed, the Eighth Circuit has "distinguished claims of general misconduct or unsatisfactory performance from claims involving *direct* dishonesty, immorality, criminality[,] or racism."[55]   Only the latter meet the necessary stigma threshold.

The Court is not exactly clear which statement or statements Ms. Gray alleges to be the stigmatizing ones.   Perhaps she is referring to the Notice of Disciplinary Action, which says Ms. Gray was discharged because she "posted on social media unprofessional posts/comments to a public incident that had occurred on Wednesday, September 10, 2025."[56]   The Notice also notes that "the [Department] received a complaint regarding social media posts by [Ms.] Gray."[57]   These statements—which do not discuss even generally the content or viewpoint of Ms. Gray's social media comments—come nowhere close to meeting the "so damaging" threshold.   Generically accusing someone of posting unprofessional comments is not the same as accusing them of "dishonesty, immorality, criminality[,] or racism."[58]

---

[53] *Winskowski*, 442 F.3d at 1110 (quoting *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994)).

[54] *Correia v. Jones*, 943 F.3d 845, 848 (8th Cir. 2019) (quoting *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014)).

[55] *Id.* (quoting *Crews*, 771 F.3d at 1092).

[56] Ex. C (Termination Communication) to Aff. of Joy Gray (Doc. 8) at 8.

[57] *Id.*

[58] *Correia*, 943 F.3d at 848 (quoting *Crews*, 771 F.3d at 1092).

The Notice of Disciplinary Action included an attachment that listed the policies that the Department believed to be violated by Ms. Gray's posts.[59]  One policy prohibited "[t]he use of threatening or abusive language or actions, posting [of] offensive material, any harassment, or discourteous, indecent, or immoral conduct."[60]  This is not stigmatizing under the Eighth Circuit's standard.  Part of the policy prohibits posting offensive material or acting in a discourteous way.  And it is this part that logically lines up with the Notice of Disciplinary Action's accusation that Ms. Gray made unprofessional social media posts/comments.  In context, the Notice's reference to this policy would not reasonably suggest to a future employer (or anyone else) that Ms. Gray used threatening or abusive language, or engaged in harassment, indecent conduct, or immoral conduct.

The other policy included in the attachment is so broadly worded that it also does not add anything to the mix in terms of stigma.  An employee could violate this policy by "engag[ing] in . . . conduct . . . that may be injurious to the [Department], or which interferes with [its] efficient operations," or which "damages the reputation of [the Department]," or which "interferes with the [Department's] ability to serve customers and the public . . . ."[61]  Once again, this policy's inclusion as an attachment to the Notice of Disciplinary Action would not reasonably suggest to anyone that Ms. Gray engaged in conduct that amounted to "dishonesty, immorality, criminality[,] or racism."[62]

Ms. Gray's Complaint, affidavit, and preliminary injunction motion imply that the Department's response to her grievance was stigmatizing.  But the Court finds nothing in the

---

[59] Ex. C (Termination Communication) to Aff. of Joy Gray (Doc. 8) at 10.

[60] *Id.*

[61] *Id.*

[62] *Correia*, 943 F.3d at 848 (quoting *Crews*, 771 F.3d at 1092).

15

Department's response stigmatizing at all.[63]   There is no reference to the underlying reason Ms. Gray was terminated.  In her affidavit, Ms. Gray does say that the Department "denied [her] grievance and asserted, incorrectly, that [she] had 'refused' to submit a rebuttal."[64]  Ms. Gray also says that the Department "cited" as a reason for her termination the "reaction" she had in a meeting with the Department's Legal Counsel and the Director of Health Advancement.[65]  Putting aside the lack of documentary evidence to back up these assertions, there is no evidence that these two statements were made part of her file or otherwise publicized.  And, in any event, they too do not directly imply "dishonesty, immorality, criminality[,] or racism."[66]

Lastly, Ms. Gray's affidavit notes that she "was not afforded a name[-]clearing hearing to rebut stigmatizing reasons disseminated within the agency and to prospective employers, including insinuations about [her] honesty, temperament, and fitness for public service."[67]  To the extent this is supposed to be affirmative evidence of such statements, the Court gives it no weight.  Ms. Gray's assertion is entirely conclusory.  What specific statements concerning honesty, temperament, and fitness for public service is she talking about, and to whom were they made?  We do not know, because Ms. Gray does not tell us.[68]

---

[63] Ex. D (Grievance Submissions and Denial) to Aff. of Joy Gray (Doc. 8) at 12.

[64] Aff. of Joy Gray (Doc. 6) at 3.

[65] *Id.* at 3–4.

[66] *Correia*, 943 F.3d at 848 (quoting *Crews*, 771 F.3d at 1092).

[67] Aff. of Joy Gray (Doc. 6) at 4.

[68] The only other possible statement of which Ms. Gray might be complaining is a statement made by the Department's Legal Counsel in a meeting with Ms. Gray and her supervisor.  *See* Aff. of Joy Gray (Doc. 6) at 3.  Referring collectively to Ms. Gray's social media comments concerning Mr. Kirk, the Department's Legal Counsel accused Ms. Gray of "victim-blaming."  *See id.*  Putting aside the fact that there is no evidence this statement was published or disseminated widely within the Department, this statement does not suggest "dishonesty, immorality, criminality[,] or racism."  *Correia*, 943 F.3d at 848 (quoting *Crews*, 771 F.3d at 1092).  And, of course, to the extent Ms. Gray is claiming stigma from the social media posts themselves, she made those statements.  The mere fact that a spotlight was put on her social media comments because of her termination does not transform those comments into stigmatizing statements made by the Department.

To make a long story short, Ms. Gray has not shown a likelihood of success on the merits of her name-clearing-hearing claim.[69] Indeed, Ms. Gray is so far from a likelihood of success on the merits—which courts generally understand to be the most important factor of the preliminary injunction framework—that the Court would exercise its discretion not to issue a preliminary injunction even if the other factors cut as strongly as possible in her favor. As many a court has made plain, "the absence of a likelihood of success on the merits *strongly* suggests that preliminary injunctive relief should be denied . . . ."[70]

Ms. Gray's analysis of the other three factors is paper-thin. She says only this: "As to irreparable harm, Plaintiff needs to get her side of this story out. As to injury to Defendants, there will be none by having a hearing. It is in the public interest for constitutional rights to be observed."[71] Ms. Gray's single-sentence argument for each of the non-merits-related *Dataphase* factors is insufficient to carry her burden on those factors. But, again, even if she had met her burden on those factors, and even if they all strongly cut in her favor, the Court would not grant a preliminary injunction, because Ms. Gray's chance of success on the merits of her name-clearing-hearing claim is close to zero.

## CONCLUSION

For the reasons stated above, the Court DENIES the Motion for Preliminary Injunction in its entirety.

---

[69] Given what the Court has already said about the merits of the name-clearing-hearing claim, the Court need not determine whether placing stigmatizing information into a personnel file on its own constitutes publication.

[70] *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (emphasis added); *see also Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) ("The likelihood of success on the merits is '[t]he most important of the *Dataphase* factors.'" (quoting *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998))); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("[Likelihood of success on the merits] is the most important factor. . . . Thus, a court need not consider the other factors if a movant fails to show a likelihood of success on the merits." (internal quotation marks and citations omitted)).

[71] Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. (Doc. 23) at 10 (cleaned up).

IT IS SO ORDERED this 21st day of November 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE